# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JANELL C. BOONE,

                    PLAINTIFF,

-VS-                                                        CASE NO.  6:05-CV-22-ORL-KRS

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

                    DEFENDANT.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Janell C. Boone, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration (SSA).  Doc. Nos. 10, 11.  This matter has been referred to me for

disposition pursuant to 28 U.S.C. § 636(c).

## I.      PROCEDURAL HISTORY.

On February 20, 2002, Boone filed applications for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401, *et seq*., and supplemental security income payments under the

Supplemental Security Income for the Aged, Blind, and Disabled Program (SSI), 42 U.S.C. §

1382, *et seq*., alleging a disability onset date of September 15, 2000.  TR. 82-84, 275-77.  Boone's

applications were denied, initially and upon reconsideration.

Boone requested a hearing before an administrative law judge (ALJ), which was held on April 22, 2004.  Boone testified at the hearing.  She was represented by a "non-attorney."[1]  TR. 28-63.

After considering the testimony and the medical evidence presented, the ALJ found that Boone had not engaged in substantial gainful activity since the alleged onset date of her disability. TR. 13.  The ALJ concluded that the medical evidence indicated that Boone suffered from osteoarthritis of the left knee – degenerative joint disease, chronic lumbar back pain syndrome – degenerative disc disease, dysthymia[2] with a global assessment of functioning (GAF) of 65,[3] and hypertension – well controlled.  TR. 16.  The ALJ determined that Boone's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  *Id*.

_____

[1] Boone is represented by counsel in the present appeal.

[2] "A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness ."  STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995) (STEDMAN'S).

[3] The GAF scale is used to report an individual's overall level of functioning.  A rating of 61-70 reflects:

Some mild symptoms (eg, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (eg, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (SYNOPSIS OF PSYCHIATRY).

The ALJ found that Boone had the residual functional capacity (RFC) "to perform the exertional demands of sedentary work, or work which is generally performed while sitting and never requires lifting in excess of 10 pounds . . . ." TR. 18.[4]  The ALJ further found that "due to mental problems, [Boone] had no restrictions of daily activities, slight difficulties in daily functioning, slight deficiencies of concentration, persistence, or pace, and has never had any episodes of deterioration or decompensation in work or work-like settings." TR. 17.  The ALJ determined that Boone's depression was not severe.  *Id*.

The ALJ concluded that "Boone's statements concerning her impairments and their impact on her ability to work [were] not entirely credible in light of [her] own description of her activities and lifestyle, the degree of medical treatment required, the reports of the treating and examining practitioners, and the findings made on examination." TR. 16.  Specifically, the ALJ noted that Boone was able to ambulate without the use of assistive devices, "and at times, perform activities completely inconsistent with her subjective limitations, such as – cleaning the kitchen, driving her parents to doctors' appointments, grocery shopping, doing the laundry, and using the computer." TR. 18.  As for Boone's allegations of depression and memory/concentration problems, the ALJ observed that she  was able to drive a car and he noted that "[t]he ability to drive an automobile requires a great deal of concentration, understanding, remembering and carrying out of complex

---

[4] Sedentary work is defined by the regulations as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a) (OASDI); 416.967(a) (SSI).  The regulations further provide that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  *Id*.

functions[,] [and] . . . the ability to exercise independent judgment as well as involving a certain level of stress." TR. 17.

In addition, the ALJ made repeated references to the fact that Boone had not been entirely compliant in taking and obtaining refills of prescribed medications. TR. 14, 17. The ALJ noted that "the Commissioner may deny benefits for failure to follow treatment when the claimant, without good reason, fails to follow a prescribed course of treatment that could restore the ability to work." TR. 17.

In closing, the ALJ found that Boone's past relevant work as a telemarketer did not require the performance of work-related activities precluded by her residual functional capacity. TR. 19. Consequently, the ALJ determined that Boone was not disabled. TR. 20.

Boone requested review of the ALJ's decision by the Appeals Council. TR. 8. On December 1, 2004, the Appeals Council denied Boone's request for review. TR. 5-7. This appeal timely followed. Doc. No. 1.

## II.      JURISDICTION.

The ALJ's decision become the final decision of the SSA once the Appeals Council denied Boone's request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981 (OASDI), 416.1481 (SSI). This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

### III.    STATEMENT OF FACTS.

A.    *Boone's Testimony*.

Boone was born on June 27, 1947.  TR. 35.  She completed high school and attended college for two to three years.  TR. 173.  At the time of her hearing, she lived with her parents and sister in her parents' home.  TR. 34.

Boone previously worked as a domestic worker, nanny, personal assistant, teaching assistant, telemarketer, and customer service representative.  TR. 13, 36, 108, 116-23.  Boone's most recent employment was as a domestic worker.  TR. 36.  Boone reported that her job as a telemarketer "consisted of sitting for 4 hours – calling people to subscribe: to USA Today Newspaper based on commission, [and] use of a computer and telephone."  TR. 123.

Boone injured her "left side" in September 2000 while riding a train in Atlanta, Georgia.  TR. 38.  She also injured her knee stepping off a bus in September 2000.  TR. 154.  Boone had not worked since these accidents.  TR. 38.  Boone injured her neck and fractured her right ankle shortly before her hearing.  She was wearing a brace on her right ankle at the hearing.  TR. 39.

Boone testified that her biggest problems were anxiety and depression.  TR. 41.  She also had hypertension, which required that she avoid stressful situations.  TR. 48.  She explained that she wanted to seek treatment for her anxiety and depression but that she simply could not afford to do so.  TR. 42, 45, 100.  Boone stated that she did not "trust people any more" and that she did not "socialize at all."  TR. 43.  She suffered from crying spells.  TR. 61-62.  She also had trouble with her memory and concentration.  TR. 43, 54.

Boone was unable to sit for long periods of time due to a herniated disk in her lower back. TR. 43-44.  Specifically, Boone testified that she was unable to sit for longer than an hour at a time.  TR. 49.  She also had difficulty bending.  TR. 51.  She was in pain  "most of the time," and she had to lie down throughout the day.  TR. 44.  Boone described the pain as "piercing," "sharp," and "very uncomfortable."  TR. 44-45.  Pain killers made her drowsy. TR. 45.

Boone testified that she was unable to stand for long periods due to pressure under her knees, mainly her left knee.  TR. 45-46.  Specifically, Boone stated that she was unable to stand for more than five to ten minutes.  TR. 50.  Boone's left knee was swollen at the hearing.  TR. 47. She was unable to walk a block due to pain in her knees and back.  TR. 51. She sometimes elevated her leg during the day to relieve the pain.  TR. 99.

Boone testified that she had trouble buttoning things due to numbness in her hands and fingers.  TR. 52.  Her hands also shook, causing her difficulty in writing in script, although she could print.  R.  59.

She was able to perform some household chores, such as dusting, but she had trouble with other activities, such as picking up a basket of clothes and making a bed.  TR. 52-53, 60, 96, 100. Boone testified that she was able to lift one or two pounds "comfortably."  TR. 53.  She was unable to walk up stairs due to her knees and back.  TR. 56.

Boone usually went to sleep at approximately 9:00 or 10:00 p.m., and she normally woke up at around 7:45 a.m.  *Id*.  She had trouble sleeping at night, and she took naps during the day. TR. 57. She tired easily.  TR. 100.  During the day, she read books and watched TV.  TR. 58.  She

was able to use a computer to receive e-mail.  TR. 61.  Boone was able to drive, but not for long periods.  TR. 40, 55.

B.      *Medical Evidence*.

Boone was treated for various ailments at Oakhurst Community Health Center from November 1997 to June 2000.  TR. 132-38.  On November 18, 1997, the attending nurse noted that Boone complained of lower back pain extending to her right upper buttock.  Boone was assessed with "lumbar strain vs. early sciatica,"[5] and hypothyroidism[6], and treated with medication.  TR. 137.   On December 23, 1997, the attending physician noted that a patient assistance form had been requested for Boone under an indigent care program.  TR. 136.  On April 28, 1998, Boone complained of chronic back pain and parethesias[7] in her left arm and leg.   TR. 135.

In September 2000, Boone sought treatment at an emergency room.  TR. 144-53.  She reported that she was injured while riding a commuter train.  She had neck pain, hip pain and was generally "'sore all over.'" TR. 146.  Later in the month, Boone again sought emergency room treatment.  She reported that her left knee "popped" when stepping off a bus.  TR. 154.  The

---

[5] "Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to herniated lumbar disk compromising the L5 or S1 root." STEDMAN'S at 1580.

[6] "Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, somnolence and sometimes myxedema." STEDMAN'S at 841.

[7] "An abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S at 1300.

assessment, confirmed by x-ray, was that Boone had a closed dislocation of the left patella (kneecap).  TR. 154, 161.

On October 12, 2000, Syed T. Rahman, M.D., prepared an Initial Examination/Evaluation Report after examining Boone.  TR. 141-43.  Dr. Rahman noted that Boone complained of pain and stiffness in her neck and bilateral lower lumbar pain with muscle spasms.  TR. 141.  Boone rated the pain as a six on a scale of one to ten, with ten being the most severe pain.  Dr. Rahman noted that Boone's movements seemed to be restricted.  Cervical and lumbosacral range of motion (ROM) testing revealed decreased flexion, extension, and left and right lateral flexion.  TR. 142-43.  Dr. Rahman diagnosed Boone with cervicalgia (neck pain), myofascitis[8], low back pain, and lumbar sprain/strain.  He noted that Boone's prognosis was guarded.  TR. 143.

Treatment notes from Chandler Pain Management Center LLC reflect that Boone was treated for neck, lower back, and knee pain on several occasions in October 2000.  TR. 139-40.

In December 2000, Boone was treated at Mariners Medical Center for a left knee sprain. TR. 163-68.  The treating physician prescribed Lortab and a knee brace.  TR. 165.

Boone was treated by Son L. Chau, M.D., on several occasions from March 2001 to March 2004.  TR. 201-09, 251-54, 263-64.  On March 9, 2001, Dr. Chau assessed Boone with, among other things, hypothyroidism and low back pain/skeletal sprain.  He recommended Darvocet and

---

[8]  "An inflammation of the thin layer of fibrous tissue (fascia) that surrounds a muscle and attaches it to the bone."  Myofascitis, found online at http://my-info.medicine-for-you.com/ 404,28699571291234567890103070592411/myofascitis.htm (last visited March 21, 2006).

Skelaxin. TR. 209.  On April 6, 2001, Dr. Chau noted that Boone's back pain had improved.  TR. 206.  He also noted that a bone density test had revealed osteopenia.[9]  *Id*.

On August 8, 2001, Boone presented to Dr. Chau with complaints of pain in her right arm, particularly the elbow, neck pain, and upper left knee swelling.  TR. 205.  Dr. Chau assessed Boone with epicondylitis, skeletal pain, and knee swelling.  *Id*.  On December 5, 2001, Dr. Chau noted that  Boone's left knee pain had improved.  TR. 203.  On February 5, 2002, Boone presented to Dr. Chau with complaints of severe pain in her left knee, memory loss and chronic fatigue.  Dr. Chau noted that Boone was "trying to get disability."  TR. 202.  Dr. Chau also noted that Boone had not taken the medications he had previously prescribed for knee pain, and he instructed her to fill those prescriptions.  *Id*.

On April 3, 2002, Michael Harrell, Ph.D., examined Boone and prepared a psychological evaluation at the request of the SSA.  TR. 169-75.  He noted that Boone demonstrated adequate concentration and attention during the interview.  She was also cooperative during testing, although she worked at a slow pace.  Dr. Harrell administered a Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) test to Boone.  He noted that Boone "had difficulty with subtests in a manner which was puzzling to the examiner."  TR. 170.  She scored in the Borderline Range and at the fifth percentile for the normative population.  Dr. Harrell noted that Boone demonstrated significantly low scores in the Delayed Memory Subtests.  He hypothesized that "this differential may have been related to needs to submit a reduced

_____

[9] "Decreased calcification or density of bone; a descriptive term applicable to all skeletal systems in which such a condition is noted; carries no implication about causality."  STEDMAN'S at 1270.

performance to establish memory dysfunction." TR. 171.  Dr. Harrell recommended further

neuropsychological testing "to establish a clearer picture."  TR. 172.

Dr. Harrell diagnosed Boone with dysthymia, secondary, late onset, mild to moderate.  *Id*.

Dr. Harrell assigned Boone a GAF of 65.  He noted that Boone had "not been fully compliant with

medical care and ha[d] not allowed treatment for psychological complaints."  *Id*.

On May 6, 2002, Nitin Haté, M.D., examined Boone at the request of the SSA.  TR. 173-

75.  Boone complained of left knee pain and swelling, left arm numbness, low back pain, difficulty

in prolonged standing and walking, and depression.  Dr. Haté noted the Boone had mild swelling

in her left knee and that she walked with a limp.  TR. 173.  Her ability to squat was limited.  TR.

174-75. Straight leg raising was negative bilaterally.[10]  TR. 174.  Dr. Haté observed that Boone's

muscle and grip strength were normal and that she had full range of motion except in her

thoracolumbar spine.  *Id*.  Dr. Haté opined that Boone "[would] have difficulty in activities that

require prolonged standing, walking, climbing stairs, and repetitive squatting or stooping."  TR.

175.

On July 24, 2002, Boone presented to Dr. Chau with complaints of right-sided back pain

and right leg, hip and arm pain.  TR. 201.  Dr. Chau noted that Boone had mild tenderness in her

right hip area and normal ROM.  Dr. Chau assessed Boone with probable bursitis/tendonitis and

---

[10] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'"  *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

hypothyroidism.  *Id*.  On August 6, 2002, Boone complained of back and hip pain on the right improved with medication.  The assessment was muscle sprain and tendonitis, which was treated with medication.  TR. 200.

On November 18, 2002, G.A. Amicarelli, D.C., a chiropractor, prepared an RFC assessment for Boone.  TR. 238-40.  Dr. Amicarelli opined that Boone could occasionally lift ten pounds.  TR. 239.  She could stand or walk less than one hour and could sit for three hours in an eight-hour workday.  TR. 238.  She did not require the use of an assistive device to stand or walk, but she did "need assistance to stand, balance, [and] project from [a] sitt[ing] position."  *Id*.  She needed to be able to alternate positions every ninety minutes and to elevate her left foot every sixty minutes.  She also required assistance to perform bending or stooping activities.  *Id*.  She was unable to perform the following repetitive actions with her left hand: (1) simple grasping; (2) pushing and pulling of arm controls; and (3) fine manipulation.  She had reduced grip strength and numbness in her left hand.  TR. 239.  Dr. Amicarelli noted that Boone required "[c]omplete freedom to rest frequently throughout the day[.]"  TR. 240.

On January 13, 2003, Ronald I. Landau, M.D., interpreted an MRI of Boone's spine.  TR. 258-59.  Dr. Landau's impression was disk herniation at L1-2, disk bulging at L4-5, and probable perineural cysts.  TR. 259.

Handwritten treatment notes included in Dr. Chau's records reflect that, on March 13, 2003, Boone complained of chronic back pain and occasional knee pain.  TR. 255.

On August 2, 2003, Boone was treated at Orlando Regional Healthcare Center for cervical and neck pain.  TR. 242-44, 246.  She was diagnosed with cervical strain.  TR. 246.

On November 25, 2003, Boone presented to Dr. Chau with complaints of left arm pain, numbness and tingling radiating down her chest that caused tightness while driving, numbness on the left side of her face, and left neck pain.  TR. 254.  Dr. Chau assessed Boone with atypical chest pain, neck pain with radiculopathy,[11] hypothyroidism, and elevated blood pressure.  *Id.*  In January 2004, Dr. Chau assessed Boone with osteoporosis.  TR. 252-53.

On March 22, 2004, Boone presented to Dr. Chau following an accident that took place at her home.  TR. 264.  Boone complained of right leg and foot pain with swelling with decreased ROM, mild back pain, and pain in the back of her head.  *Id.*  On March 23, 2004, Jack L. Berger, M.D., reviewed x-rays that disclosed that Boone had suffered a hairline fracture in her right fibula.[12]  TR. 257; *see also* TR. 263.  An emergency room record dated March 25, 2004, reflects that Boone was instructed to use a knee immobilizer.  TR. 262.

On April 7, 2004, Boone was treated by Victor McNamara, a podiatrist.  TR. 265.  Dr. McNamara diagnosed Boone with a fractured fibula, right ankle, and he placed her in a removable walking cast.  *Id.*

---

[11]  "Doctors use the term radiculopathy to specifically describe pain, and other symptoms like numbness, tingling, and weakness in your arms or legs that are caused by a problem with your nerve roots."  Back.com, found online at http://www.back.com/symptoms-radiculopathy.html (last visited March 21, 2006).

[12]  Calf bone.  STEDMAN'S at 651.

C.      *Reviewing Professionals*.

1.      <u>Physical RFC Assessments</u>.

On May 18, 2002, M. delaCerna, M.D., reviewed Boone's records and prepared a physical

RFC assessment at the request of the SSA.  TR. 178-85.  Dr. delaCerna opined that Boone could

frequently lift ten pounds and occasionally lift twenty pounds.  She could stand or walk (with

normal breaks) at least two hours in an eight-hour workday.  TR. 179.  She could sit for about six

hours in an eight-hour workday.  Her ability to push and/or pull was unlimited.  She could only

climb and kneel on the left occasionally.  TR. 180.

On October 6, 2002, Gloria B. Hanks, M.D., reviewed Boone's records and prepared a

physical RFC assessment at the request of the SSA.  TR. 214-21.  Dr. Hanks opined that Boone

could frequently lift ten pounds and occasionally lift twenty pounds.  She could stand or walk

(with normal breaks) and sit about six hours in an eight-hour workday.  Her ability to push and/or

pull was unlimited.  TR. 215.  She could only climb, balance, stoop, kneel, crouch or crawl

occasionally.  TR. 216.

2.      <u>Mental Assessments</u>.

On June 6, 2002, David R. Cox, Ph.D., reviewed Boone's records and prepared a

psychiatric review technique form at the request of the SSA.  TR. 186-99.  Dr. Cox noted that

Boone suffered from an affective disorder, specifically dysthymia.  TR. 186, 189.  Dr. Cox opined

that Boone's mental impairment resulted in mild restriction of activities of daily living, mild

difficulties in maintaining social functioning, and mild difficulties in maintaining concentration,

persistence, or pace.  In addition, Dr. Cox indicated that Boone's mental impairment would result in no episodes of decompensation.  TR. 196.

On October 22, 2002, Jeffrey L. Prickett, Psy.D., reviewed Boone's records and prepared a psychiatric review technique at the request of the SSA.  TR. 222-34.  Dr. Prickett noted that Boone suffered from an affective disorder, specifically dysthymia.  TR. 222, 225.  Dr. Prickett opined that Boone's mental impairment resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  In addition, Dr. Prickett indicated that Boone's mental impairment would result in no episodes of decompensation.  TR. 232.

Dr. Prickett also prepared a mental RFC assessment.  TR. 235-37.  In sum, Dr. Prickett opined that Boone had moderate limitations in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  TR. 235-36.  Dr. Prickett also opined that Boone was able to understand, remember and carry out simple instructions.  She could make simple decisions and do routine tasks that were within her physical limits.  She could concentrate on simple tasks and her social and adaptive functioning appeared to be adequate.  TR. 237.

## IV.    STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the

correct legal standards. *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1986).  While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

The Court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the SSA's decision. *Id*. at 1000.  Even if the Court finds that the evidence weighs against the SSA's decision, it must affirm if the decision is supported by substantial evidence. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The Court may not reweigh the evidence or substitute its own judgment for that of the SSA. *Id*.  When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI or SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"[13]  42 U.S.C. §§ 423(d)(1)(A) (OASDI), 1382c(a)(3)(A) (SSI). The Act provides further that a claimant is not disabled if he is capable of performing his previous work or, if "considering his age, education, and work experience, [he could] engage in any other

---

[13] A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3) (OASDI), 1382c(a)(3)(D) (SSI).

kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§
423(d)(2)(A) (OASDI), 1382c(a)(3)(B) (SSI).  Pursuant to 42 U.S.C. § 405(a), the SSA has
promulgated a five-step inquiry which must be followed in determining whether a claimant is
entitled to OASDI or SSI benefits.  In sum, when evaluating a claim for benefits under OASDI or
SSI, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment or combination of impairments severe?
> (3) Does the claimant's impairment(s) meet or equal one of the specific
> impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?[14]

20 C.F.R. §§ 404.1520(a)(4) (OASDI), 416.920(a)(4) (SSI).

An affirmative answer to any of the above questions leads to either the next question, or,
on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not
disabled."  *See, e.g., McDaniel*, 800 F.2d at 1030.

## V.    ANALYSIS.

Boone raises several interrelated issues on appeal.  Boone argues that the ALJ erred by
failing to find that her mental impairment was severe.  She contends that the ALJ also erred by
failing to develop fully the mental requirements of her past relevant work as a telemarketer.  She
posits that the ALJ should also have required further medical treatment, as recommended by
consulting physicians, to determine the extent of her physical and mental impairments.  Finally,

---

[14] In an OASDI case, a claimant must also establish that she was disabled during the time
that she was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d
1088, 1090 (5th Cir. 1979).

she asserts that the ALJ erred by improperly considering her failure to follow prescribed treatment. These are the only issue I will address.

A.       *Functional Limitations Arising from Mental Impairments.*

The ALJ concluded that Boone had dysthymia, which was a severe impairment.  Boone's argument regarding the severity of her mental impairment must, therefore, be directed to the question of whether she had functional limitations arising from dysthymia that would have limited her ability to work.

When assessing limitations arising from pain and other subjective symptoms, an ALJ is required to follow this circuit's pain standard.  "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir.  1995) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.

With respect to mental limitations, the ALJ recognized that Boone's condition could cause limitations.  However, he concluded based on the evidence that these limitations would result in no restrictions of daily activities, slight difficulties in daily functioning, and slight deficiencies of concentration, persistence, or pace.  TR. 17.  He articulated the following explicit reasons for

-17-

reaching this conclusion:

> As for the claimant's complaints of depression and memory/concentration problems, the record reflects that she drives a motor vehicle.  The ability to drive an automobile requires a great deal of concentration, understanding, remembering and carrying out of complex functions.  It also requires the ability to exercise independent judgment as well as involving a certain level of stress.
>
> . . . .
>
> In addition, Dr. Harrell assessed the claimant on the GAF scale as a 65.  Under the GAF scale a rating of 61 to 70 indicates that there are some mild symptoms such as a depressed mood and mild insomnia or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships.  Likewise, there is no evidence of psychiatric hospitalizations and no evidence of loss of employment due to a mental disorder.  The claimant has presented herself as fully oriented, without any evidence of delusions, hallucinations, or formal thought disorder.  She has been described as cooperative and having insight into her situation.  She is able to engage in a full range of routine day-to-day behaviors required for personal care, independent living, and reasonable social/vocational pursuits.
>
> While the claimant reported deficiencies in concentration, there is no evidence to support this.  Mental-status examinations have shown that the claimant's attention, concentration, and memory were all within normal limits.
>
> . . . .
>
> The medical source statements of the State agency review physicians, in particular, are generally consistent with, but less restrictive than the substantial evidence in the case record.

TR. 17-18.  These findings are supported by substantial evidence in the record.

Dr. Harrell observed that Boone's concentration and attention during his interview of her were adequate, and that she was cooperative.  While Dr. Harrell's testing reflected that Boone

-18-

scored poorly in relation to delayed memory, he observed that the score might have been influenced by Boone's desire to support her claims that she had memory problems.  Further, his ultimate assessment was that Boone's dysthymia was only "mild to moderate," and he assigned her a GAF score of 65, which also indicated mild symptoms.  Dr. Cox, a reviewing physician, similarly found that Boone had only mild functional limitations arising from her mental impairments.

Dr. Prickett, another reviewing physician, concluded that Boone had moderate limitations in concentration, memory and related functional tasks.  His notes indicate that he based this conclusion primarily on Dr. Harrell's testing.  TR. 234.  The ALJ was entitled to credit Dr. Harrell's opinion over that of Dr. Prickett, because Dr. Harrell was a consulting physician who actually examined Boone, rather than simply reviewing her medical records.  *See* 20 C.F.R. § 404.1527(d)(1) (OASDI) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); *accord* 20 C.F.R. § 416.927(d)(1) (SSI).

Substantial evidence in the record also supports the ALJ's conclusions regarding Boone's activities of daily living.  She acknowledged that she was able to drive.  Even if the driving was only for limited times and distances, it still required the care and concentration described by the ALJ.  She was also able to use a computer to check e-mail and do household chores.

The ALJ properly applied the pain standard.  He articulated explicit and adequate reasons for his conclusion that Boone's mental impairments resulted in only mild limitations on her

functional abilities.  As such, there was no error in determining that Boone's mental impairment did not result in severe functional limitations.

Because substantial evidence supports the ALJ's conclusion that Boone's mental impairment did not result in significant limitations on her ability to work, there was no need for the ALJ to develop more fully the mental demands of her past relevant work.

B.      *Need for Further Examinations.*

Boone contends that the ALJ erred by failing to order further neuropsychological testing, as recommended by Dr. Harrell, to more fully develop her mental impairments.  She contends, as well, that the ALJ erred by failing to order an MRI in response to Dr. Haté's notation that internal derangement of her left knee could not be ruled out.

"In fulfilling his duty to conduct a full and fair inquiry, the administrative law judge is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision."  *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988) (internal quotation marks and citation omitted).  In this case, the record was sufficient to provide the ALJ with a basis to assess the functional limitations arising from Boone's physical and mental impairments.  While additional examinations might have provided the ALJ with more evidence on the question of whether Boone's scores on the delayed memory test were the result of organic factors rather than lack of motivation,[15] the law "does not require absolute certainly; it requires only substantial evidence to sustain the [Commissioner's]

---

[15]  Boone does not clearly state how further examination on the question of whether she had an internal derangement of a knee would have changed the ALJ's decision.

findings." *Id*.  Accordingly, I conclude that the ALJ did not err by failing to order further examinations.

      *C.*       *Noncompliance with Treatment*.

      Boone's final argument is that the ALJ erred in relying upon her failure to seek treatment and take medication because the evidence established that she was too poor to do so.  Generally, "[p]overty excuses noncompliance with treatment." *Zeigler v. Barnhart*, 310 F. Supp. 2d 1221, 1226 (M.D. Fla. 2004) (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)).

      This is not a case in which the ALJ totally ignored evidence that the claimant could not afford treatment.  Rather, the ALJ acknowledged Boone's testimony that she did not seek treatment for depression because "she has no money."  TR.  16.  Furthermore, noncompliance with treatment was not the only basis for the ALJ's conclusion that Boone's testimony about the limitations arising from pain was not entirely credible.  The ALJ articulated other explicit reasons for finding Boone's testimony to be not entirely credible, which reasons are adequate to support his conclusion and supported by substantial evidence in the record.  Therefore, any error that the ALJ may have made in assessing the reason that Boone was not compliant with treatment was harmless.

**VI.    CONCLUSION.**

It is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of

Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 21st day of March, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties